**Joseph RAY, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 31A01–0407–CR–329.

Court of Appeals of Indiana.

Dec. 6, 2005.

Transfer Denied Feb. 2, 2006.

---

Matthew Jon McGovern, Evansville, for Appellant.

Steve Carter, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

SHARPNACK, Judge.

Joseph Ray appeals his conviction for battery resulting in death as a class A felony.[1] Ray raises three issues, which we revise and restate as:

I. Whether the trial court abused its discretion by denying Ray's motion for mistrial based on the prosecutor's violation of a witness separation order;

II. Whether the trial court erred by refusing to instruct the jury on the State's failure to produce evidence;

III. Whether the trial court abused its discretion by imposing the presumptive sentence; and

IV. Whether the sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

The relevant facts follow. Blake Barger was born on December 30, 1999, to Michelle Loney and Dennis Barger. In December 2001, Michelle's sister, Stacy Ray,

and Stacy's husband, Ray, began to babysit for Blake while Michelle was at work.

On the morning of January 16, 2002, Blake was acting "normal." Transcript at 444. Michelle drove Blake to Ray's house, arriving at around 8:10 a.m. Michelle and Stacy both left Ray's house at around 8:15 a.m., leaving Blake in Ray's care. Two of Ray's daughters were upstairs in bed.

At just after 9:00 a.m., paramedics were dispatched to Ray's house after he called 911 and reported that Blake was having trouble breathing. When the paramedics arrived, they found Blake unresponsive, very pale, and breathing less than normal for a child of his size. When Blake arrived at the Harrison County Hospital, he exhibited "decerebrate posturing," which is a type of head movement characteristic of a severe head injury and severe damage to the cortex or the cerebrum. Transcript at 609–611. Dr. Gregory West noticed that Blake had bilateral retinal hemorrhages, which were indicative of shaken baby syndrome. Dr. West immediately suspected shaken baby syndrome after seeing the presentation of the movement abnormalities, the unresponsiveness, and the retinal hemorrhages.

Blake was airlifted to Kosair Children's Hospital in Kentucky. Blake had a massive subdural hematoma[2] with compression of the brain. Dr. Thomas Moriarty, the Director of Pediatric Neurosurgery, performed brain surgery on him. When Dr. Moriarty opened the dura, "an awful lot of blood" came out, which indicated an acute injury. *Id.* at 733–734. Blake had "[q]uite remarkable swelling" of the brain. *Id.* at 737–738.

Dr. Vicki Montgomery cared for Blake while he was in the pediatric ICU follow-

---

1. Ind.Code § 35–42–2–1 (2004).

2. A subdural hematoma is "a collection of blood which is trapped between the surface of

the brain and the . . . one of the outer linings of the brain, the dura." Transcript at 730.

ing surgery. Blake was unresponsive, very cold, had a low heart rate, and low blood pressure. Blake had retinal hemorrhages and did not have a cough reflex, a gag reflex, or corneal reflexes. Dr. Paul Rychwalski, an expert in ophthalmology and pediatric ophthalmology, examined Blake at around 3 p.m. and found extensive retinal hemorrhages.

The next morning when Dr. Montgomery examined Blake, Blake's pupils were dilated and unresponsive to light, he still did not have corneal reflexes or a gag reflex, and could not breathe on his own. Tests showed that Blake had no blood flow to his brain. Dr. Montgomery declared Blake brain dead at 1:45 p.m. on January 17, 2002, and Blake died that same day.

Dr. Amy Burrows, an expert in forensic pathology, performed an autopsy on Blake. Dr. Burrows tested the dura from the right side of the brain and determined that Blake suffered an acute subdural hematoma. Dr. Burrows did not test the dura on the left side of the brain because she did not see it.

The State charged Ray with battery resulting in death as a class A felony for inflicting a "closed head injury to [Blake] by shaking, bouncing, hitting, and/or causing blunt force trauma to the head of [Blake], resulting in his death on January 17, 2002." Appellant's Appendix at 16. At the trial, Ray made a motion for separation of witnesses, which the trial court granted. During the jury trial, Jeremy McKim, a paramedic, testified that he performed a sternum rub on Blake. On direct examination, Dr. Burrows testified that she would not expect to see the bruise on Blake's chest to be caused by someone rubbing back and forth on the chest with their hands. On cross-examination, Dr. Burrows testified that she learned when she was in the prosecutor's office that a sternum rub was performed on Blake.

The next morning, Ray moved for a mistrial, claiming that the prosecutor had violated the separation of witnesses order. The trial court denied Ray's motion for a mistrial. The theory of Ray's defense was that he never abused Blake, Blake had struck the back of his head on a linoleum floor the day before, and Blake died as the result of an injury that exacerbated an already existing subdural hematoma.

Ray tendered an instruction, which instructed the jury that because the State did not examine, test or produce the dura overlying the left subdural hematoma, the jury could infer that this evidence would have been unfavorable to the State. The trial court refused this instruction.

The jury found Ray guilty of battery as a class A felony. At the sentencing hearing, the trial court found the following aggravating factors: (1) the injury and death of Blake was the result of shaken baby syndrome; (2) the victim was two years old; and (3) Ray is in need of correctional or rehabilitative treatment that can best be provided by commitment to a penal facility. The trial court assigned "moderate weight" to the first factor, "significant or heavy weight" to the second factor, and "very little to almost no weight" to the third factor. Appellant's Appendix at 382. The trial court found the following mitigating factors: (1) Ray has no history of delinquency or criminal activity and no criminal record; (2) Ray's imprisonment will result in undue hardship to his wife and children; (3) Ray has maintained employment and led a productive life; and (4) Ray is likely to be successful if placed on probation. The trial court assigned "moderate weight to [Ray]'s lack of criminal history, moderate weight to the undue hardship to [Ray]'s wife and children, minimal weight to [Ray's] employment and productive life, and minimal weight to [Ray's] likelihood of success if

placed on probation." *Id.* at 383. The trial court sentenced Ray to the Indiana Department of Correction for thirty years, the presumptive sentence for a class A felony.

## I.

The first issue is whether the trial court abused its discretion by denying Ray's motion for mistrial based on the prosecutor's violation of a witness separation order. The decision to grant or deny a motion for mistrial lies within the discretion of the trial court. *Francis v. State,* 758 N.E.2d 528, 532 (Ind.2001). "The grant of a motion for mistrial is an extreme remedy that is warranted only when less severe remedies will not satisfactorily correct the error." *Id.* To prevail, the defendant "must show that he was placed in a position of grave peril to which he should not have been subjected." *Id.* The gravity of the peril is determined by the probable persuasive effect on the jury's decision. *James v. State,* 613 N.E.2d 15, 22 (Ind.1993).

The primary purpose of a separation of witnesses order is to prevent witnesses from gaining knowledge from the testimony of other witnesses and adjusting their testimony accordingly. *Harrington v. State,* 584 N.E.2d 558, 562 (Ind. 1992), *reh'g denied.* In the absence of connivance or collusion by the party calling the witness, the trial court may permit the testimony of a witness in violation of a separation order. *Alexander v. State,* 600 N.E.2d 549, 553 (Ind.Ct.App.1992). Even when confronted with a clear violation of a separation order, the trial court may choose to allow the violating witness to testify. *Jordan v. State,* 656 N.E.2d 816, 818 (Ind.1995), *reh'g denied.* We will not reverse a trial court's decision on such matter absent a showing of a clear abuse of discretion. *Id.* An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." *Smith v. State,* 754 N.E.2d 502, 504 (Ind.2001).

During trial, the trial court stated:

Those of you that are expected to be witnesses in this case, you will have to wait outside the Courtroom. The separation order means that you will be prohibited from consulting with each other. You will be prohibited from hearing the testimony of other witnesses. You will be prohibited from discussing your testimony, or what has been said, or gone on, inside the Courtroom with anyone other than the attorneys in this case.

Transcript at 343.

On cross examination, McKim, testified that he performed a sternum rub on Blake and the sternum rub was "not enough to cause any bruising." Transcript at 404. On cross examination, McKim clarified that he was "not saying it's not possible" to get a bruise from a sternal rub and it was "possible" he applied a little more pressure than normal. Transcript at 405.

On direct examination, Dr. Burrows testified that the bruise on Blake's chest extended into the deeper tissues of the chest, indicating a "pretty good blow," and she would not expect such a bruise to be caused by someone rubbing back and forth on the chest with their hands. Transcript at 1167. Ray directs us to the following exchange between Ray's defense counsel and Dr. Burrows:

Q: Okay. Doctor, have you ever heard of a sternum rub?

A: Yes sir.

Q: Okay. Do you know if a sternum rub was done on Blake?

A: Uh ... I was just told that it was.

Q: When were you told that?

A: In this ... Prior to trial.

Q: When?

A: As I was sitting in the Prosecutor's Office.

Q: This morning, or today?

A: Yes sir.

Q: Okay. You didn't know that before today?

A: Correct.

Transcript at 1206–1207. The next morning, Ray moved for a mistrial, claiming that the prosecutor had violated the separation of witnesses order. The trial court denied the motion for a mistrial and stated:

[T]he separation order prohibited the witnesses from consulting with each other, prohibited them from hearing the testimony of each other and there's no asserted violation of that kind. They were prohibited from consulting with each other but it was specifically noted that the attorneys may consult with the witnesses.

Now it appears that what has happened here is that the Chief Deputy Prosecutor has consulted with a witness and advised a witness about part of the testimony of a prior witness. And, uh, the Court finds that ... that this ... what has occurred violates the spirit of the order but that it was unintentional.

\* \* \* \* \* \*

I think clearly if there was a violation it was unintentional.

\* \* \* \* \* \*

And ... And what I'm saying to both of you in the future is that you should not say that so and so said in their testimony in the Courtroom. That would be ... That I'm ordering you not to do. Okay. But at the same time if you gain a new piece of information it would certainly not be inappropriate to ask your, especially expert, witness if ... if this

had occurred what would your opinion be? Would this change your opinion or what would this ... What would this mean, if any ... anything? And ... And I don't think ... I think it was obvious from Dr. Burrows testimony that she was very open and forthright, didn't try to hide the fact that ... You know she answered every question you asked and told you exactly the truth. And I don't think there's any indication that Dr. Burrows, in any way, changed her testimony based on anything that the prosecutor had furnished to her in any way.

*Id.* at 1265–1269.

Ray argues that the trial court abused its discretion by denying the motion for mistrial because: (A) the State connived to violate the separation order; (B) the offending witness gained knowledge of answers given by another witness; and (C) the State's violation of the order placed Ray in grave peril. Ray argues the following:

The State's medical experts testified that the retinal hemorrhages and the cerebral edema sustained by Blake are exclusively symptomatic of shaken baby syndrome. (Tr. 757, 920, 928–35, 1208). Conversely, the defense presented evidence that these symptoms can be indicative of other causal events. (Tr. 1615–16, 1642–43). Thus, the evidence of the bruise on Blake's chest as explained by Dr. Burrows offered alternative proof that Blake was shaken. Because this alleged proof did not concern the dispute over symptoms of shaken baby syndrome, it was vital to the State's case, and provided the State with an end run around [Ray]'s defense. Accordingly, the State's illegal procurement of this evidence placed [Ray] in grave peril, and the trial court's error in denying the motion for mistrial is not harmless.

Appellant's Brief at 16. Ray also argues that the "State gave Dr. Burrows ample time to prepare for defense counsel's attempts to impeach her with regard to the bruise and foreclosed defense counsel's opportunity to soften Dr. Burrows resolve to the possibility that the 'sternal rub' created Blake's bruise." Appellant's Brief at 15.

■ Even assuming that the State violated the order separating witnesses, we cannot say that the violation placed Ray in grave peril. Prejudice is presumed when a violation of a separation of witnesses order occurs, but the presumption can be overcome if the non movant can show that there was no prejudice. *Stafford v. State*, 736 N.E.2d 326, 331 (Ind.Ct.App.2000) (relying on *Hernandez v. State*, 716 N.E.2d 948, 955 (Ind.1999) (Boehm, J., dissenting), *reh'g denied* ), *reh'g denied, trans. denied.*

Here, Ray's counsel cross-examined Dr. Burrows. Further, Ray's counsel questioned Dr. Burrows on how she learned that Blake had received a sternum rub. Thus, Ray was not placed in grave peril because the jury was informed of the conversation between Dr. Burrows and the prosecutor and was given adequate information to judge the credibility of Dr. Burrows. *See, e.g., Hightower v. State*, 260 Ind. 481, 486, 296 N.E.2d 654, 657 (Ind. 1973) (holding that a violation of a witness separation order did not warrant reversal because "[t]he jury was completely informed of the conversation between the witnesses ... and was given adequate information by which it could judge the reliability and credibility of the revised testimony"), *cert. denied*, 415 U.S. 916, 94 S.Ct. 1412, 39 L.Ed.2d 470 (1974). Moreover, the chest bruise was a relatively minor part of the evidence presented.

The record reveals that Blake was left in Ray's care. Dr. Gregory West testified that he diagnosed Blake as suffering from shaken baby syndrome due to the retinal hemorrhages and change in mental status. Dr. Vicki Montgomery, an expert in pediatric critical care medicine, testified that the combination of retinal hemorrhages and the subdural hematoma were indicative of non accidental trauma or inflicted trauma. Dr. Thomas Moriarty, an expert in neurosurgery and pediatric neurosurgery, testified that Blake's injuries were not consistent with the injuries that a child would receive if he fell and hit the back of his head. Dr. Moriarty testified that he did not think it was possible that Blake could have sustained this injury to the brain and then have been acting normally for any period of time. Dr. Moriarty also testified that Blake's closed head injury was most likely the result of a shaking or a shaken impact injury. Dr. Paul Rychwalski, an expert in ophthalmology and pediatric ophthalmology, testified that his findings "were very consistent with non-accidental trauma or the child having been shaken severely." Transcript at 920. Dr. Rychwalski testified that severe shaking caused the retinal hemorrhages. Dr. Betty Spivak, an expert in pediatric medicine and forensics, testified that impact and shaking caused Blake's injuries. Dr. Margie Joyce, an expert in the field of radiology and pediatric radiology, testified that the findings of subdural hematomas together with other bone fractures are highly suspicious of battered child syndrome.

Consequently, the record reveals overwhelming evidence, and any violation of separation of witnesses order was harmless.[3] There is no reasonable probability

---

**3.** Ray relies on *Thompson v. State*, 690 N.E.2d 224 (Ind.1997), and *Craun v. State*, 762 N.E.2d 230 (Ind.Ct.App.2002), *trans. denied*, for his argument that the State's violation of the separation order is not harmless error. We do not find *Thompson* and *Craun* instruc-

that Dr. Burrows's testimony regarding the chest bruise and sternum rub contributed to the verdict. *See, e.g., Osborne v. State,* 754 N.E.2d 916, 927 (Ind.2001) (holding that the error of allowing unsequestered witnesses to testify in violation of a motion to separate witnesses was harmless error because the State presented overwhelming evidence supporting defendant's conviction). Accordingly, the trial court did not abuse its discretion by denying Ray's motion for mistrial.

## II.

 The next issue is whether the trial court erred by refusing to instruct the jury on the State's failure to produce evidence. The purpose of a jury instruction is to inform the jury of the law applicable to the facts without misleading it and to enable the jury to comprehend the case clearly and arrive at a just, fair, and correct verdict. *Overstreet v. State,* 783 N.E.2d 1140, 1163 (Ind.2003), *cert. denied,* 540 U.S. 1150, 124 S.Ct. 1145, 157 L.Ed.2d 1044 (2004). In reviewing a trial court's decision to give or refuse tendered jury instructions, we consider: "(1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions that are given." *Chambers v. State,* 734 N.E.2d 578, 580 (Ind.2000), *reh'g denied.*

 Ray tendered the following instruction:

> When a party fails, without explanation, to produce certain items of evidence within the party's control you may infer that had the evidence been produced the evidence would have been unfavorable to that party's case.

In this case, the dura overlying the left subdural hematoma was not examined, tested, or produced by the medical examiner, a witness within the control of the State of Indiana. Therefore, you may infer that had the dura been examined, tested or produced in this matter that it would have been unfavorable to the State of Indiana.

Appellant's Appendix at 268. The trial court refused the tendered instruction and stated:

> Well . . . I mean as to whether or not an instruction similar to this would be appropriate under a certain set of circumstances, I think there are circumstances where an instruction like this would be appropriate to give. But I don't think this is the case. And there's a couple of reasons why that's the case. There are at least two or three reasons why.
>
> The first, and most obvious, reason is that the instruction reads when a party fails, without explanation, to produce certain items of evidence. Well first of all the . . . the presence or absence of a part of the dura of the child has been explained in pretty significant detail, number one. One of the . . . One of the . . . One of the witnesses, or maybe more than one of the witnesses, put in their report that they thought that the dura was absent. But when you compare the testimony of the surgeon that actually performed the surgery he testified under oath that he never removed any of the dura and a pretty good example of also why it is that it might have looked like that there was no dura is the expert testimony about the shriveling of the dura when it is exposed is one part

tive because they addressed the impact of the admission of prejudicial evidence and not a violation of a separation order. *See Thomp-* *son,* 690 N.E.2d at 237; *Craun,* 762 N.E.2d at 239.

of the explanation. The other part of the explanation is it would have been very hard to see it. That's quite clear from the autopsy photograph, specifically the one that was offered by the State that I refused to admit, number twelve. And also ... It's obvious from what was marked but never admitted D and E that you had, Mr. Gibson, similar photographs from different angles and different ... different positions. But it's obvious ... It's obvious that ...

First of all, as I said before, State's Exhibit 12 is a relevant piece of evidence but it is so gruesome that the Court believes that prejudice outweighs the relevance of it. And that's the reason I didn't admit that objection. But it would also be relevant to explain why it is that somebody wouldn't see the dura because of the huge, massive swelling of the child's brain. Uh ... Very extensive swelling of the brain. I believe the testimony was that the weight ...

\* \* \* \* \* \*

But when you take the amount of swelling and the circumstances I think that that's a perfectly, more than, it's not even speculative, I think ... I think it is ... What I would find it to be a very convincing reason why some part of the dura was not seen in the autopsy and the two main reasons are the huge, massive swelling of the brain, as evidenced in the photographs, and secondly, the expert opinion about the shrivel-

ing. And so ... I think the instruction is entirely inappropriate. It's refused.

\* \* \* \* \* \*

In making the ruling that I'm making on Defendant's proposed final instruction number six, as I said before, I think, a, there are ... there is more than one explanation about why the dura on the left side would not have been seen.

Transcript at 1815–1822.

■■ Ray argues that the trial court abused its discretion when it refused his instruction on the State's failure to produce evidence. We find *Nettles v. State*, 565 N.E.2d 1064 (Ind.1991), instructive. In *Nettles*, the defendant argued that the State failed to preserve potentially useful evidence and tendered an instruction that "purported to inform the jury that if they believed the police either 'destroyed and/or allowed to deteriorate evidence' then the jury could infer that the evidence would have been unfavorable to the State and beneficial to the accused." [4] *Nettles*, 565 N.E.2d at 1066–1067, 1069. On appeal, the defendant argued that the trial court erred in refusing to give his tendered instruction. *Id.* at 1068. The Indiana Supreme Court found "nothing in [the] record to justify the conclusion that the police engaged in any willful conduct in destroying evidence." *Id.* at 1069. The Indiana Supreme Court also held that "negligent handling of evidence will not be grounds for reversal unless it can be demonstrated that police acted deliberately" and conclud-

---

4. Potentially useful evidence is defined as "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Chissell v. State*, 705 N.E.2d 501, 504 (Ind.Ct.App.1999), *trans. denied* (quoting *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988), *reh'g denied* ). The State's failure to preserve potentially useful evidence does not constitute a denial of due process of law "unless a criminal defendant can show bad faith on the part of the police." *Id.* "Bad faith is defined as being 'not simply bad judgment or negligence, but rather implies the conscious doing of wrong because of dishonest purpose or moral obliquity.'" *Wade v. State*, 718 N.E.2d 1162, 1166 (Ind.Ct.App.1999), *reh'g denied, trans. denied.*

ed that the trial court was correct in refusing to give the tendered instruction. *Id.*

Here, the dura from the left side is potentially useful evidence because it had not been tested but could have been subjected to tests. *See id.* at 1067 (holding that blood samples that were not preserved by the State were potentially useful evidence). Ray does not argue that the State acted in bad faith, and the record does not reveal bad faith or willful conduct. Dr. Burrows did not test the dura from the left side of the brain because she did not see the dura on the left side, and Dr. Moriarty testified that the dural edges can shrivel "to the point of appearing absent." Transcript at 766. Because negligent handling of evidence alone will not be grounds for reversal, we conclude that the trial court did not abuse its discretion by refusing Ray's tendered instruction. *See, e.g., Nettles,* 565 N.E.2d at 1069; *Jewell v. State,* 672 N.E.2d 417, 425 (Ind.Ct.App. 1996) (holding that instruction was not supported by the evidence and was properly refused where the defendant "never seriously argued that the police exercised bad faith in failing to preserve evidence" and the police gave a "reasonable" explanation), *trans. denied.*

■■■ Even assuming the State *may* have acted in bad faith, we cannot say that the tendered instruction was not misleading. A trial court may properly refuse misleading and confusing instructions tendered by a party. *Pub. Serv. Ind., Inc. v. Nichols,* 494 N.E.2d 349, 357 (Ind.Ct.App. 1986), *reh'g denied.*

The State argues that the phrase, "without explanation," in the tendered instruction would mislead the jury because medical experts provided an explanation why the left dura had not been tested. The State directs us to Dr. Burrows' testimony that she did not see the dura on the left side of the brain and Dr. Moriarty's testimony that the dural edges can shrivel "to the point of appearing absent." Transcript at 766. Ray argues that "it is not up to the State to declare whether there is a reasonable explanation for the missing dura, as it is the sole province of the jury to make such a declaration." Appellant's Reply Brief at 9. We agree that it is the province of the jury to determine whether the explanation for the missing dura was reasonable. *French v. State,* 516 N.E.2d 40, 42 (Ind.1987) (holding that a jury could accept witness's explanation as reasonable); *see also Nelson v. Jimison,* 634 N.E.2d 509, 513 (Ind.Ct.App.1994) (holding "whether these explanations are reasonable or not depends upon matters that the jury must decide, including witness credibility"). However, the tendered instruction does not allow the jury to determine whether an explanation was made and states that the jury "[i]n this case ... may infer that had the dura been examined, tested, or produced in this matter that it would have been unfavorable to the State of Indiana." Appellant's Appendix at 268. Accordingly, we find the tendered instruction to mislead and invade the province of the jury. Consequently, the trial court did not err in refusing to give the instruction. *See, e.g., Dill v. State,* 741 N.E.2d 1230, 1233 (Ind.2001) (holding that the trial court erred by giving a misleading instruction); *Wray v. State,* 547 N.E.2d 1062, 1067 (Ind.1989) (holding that the trial court properly refused defendant's instruction because it invaded the province of the jury).

## III.

■■■ The next issue is whether the trial court abused its discretion by imposing the presumptive sentence. Sentencing decisions rest within the discretion of the trial court and are reviewed on appeal only for an abuse of discretion. *Smallwood v.*

*State,* 773 N.E.2d 259, 263 (Ind.2002). An abuse of discretion occurs if "the decision is clearly against the logic and effect of the facts and circumstances." *Pierce v. State,* 705 N.E.2d 173, 175 (Ind.1998).

When a trial court imposes the presumptive sentence, it has no obligation to explain its reasons for doing so. *Morgan v. State,* 675 N.E.2d 1067, 1073 (Ind. 1996). However, in this case, the trial court listed aggravating and mitigating circumstances in its sentencing order and, thus, was required to state its reasons for imposing the sentence it did. *Jackson v. State,* 728 N.E.2d 147, 155 (Ind.2000). "This requirement is intended to ensure that the trial court considered proper matters in determining the sentence and facilitates meaningful appellate review of the reasonableness of the sentence." *Id.*

The trial court found the following aggravating factors: (1) the injury and death of Blake was the result of shaken baby syndrome; (2) the victim was two years old; and (3) Ray is in need of correctional or rehabilitative treatment that can best be provided by commitment to a penal facility. The trial court assigned "moderate weight" to the first factor, "significant or heavy weight" to the second factor, and "very little to almost no weight" to the third factor. Appellant's Appendix at 382.

Ray argues that the trial court improperly considered: (A) Blake's age as an aggravator; and (B) Ray's need of correctional treatment best provided by a penal facility. We will address each argument separately.

A. *Blake's Age*

1. *Effect of Shaken Baby Aggravator*

Ray argues that the aggravator of Blake's age was "already covered" by the shaken baby syndrome aggravator. Appellant's Brief at 26. The trial court rec-

ognized the overlap of the element of age in both aggravators and stated:

> The trial court also takes into account the fact that these two aggravating circumstances, I'm talking about the age of the child and shaken baby syndrome, overlap one another since shaken baby syndrome involves infants or very young children. The trial court has, therefore, taken this overlap into account in weighing the aggravating circumstances against the mitigating circumstances and in considering the overall weight of all aggravating circumstances.

Transcript at 2017–2018.

"When aggravating circumstances share an element, we look to the policy or policies supporting each aggravator." *Overstreet,* 783 N.E.2d at 1162. "When the policy behind each aggravator is different, they are not impermissibly duplicative." *Id.* We find *Stevens v. State,* 691 N.E.2d 412, 433 (Ind.1997), *reh'g denied, cert. denied,* 525 U.S. 1021, 119 S.Ct. 550, 142 L.Ed.2d 457 (1998), instructive. In *Stevens,* the defendant claimed that his right to a reliable and proportional sentencing determination was violated when the jury and court considered both the fact that an intentional killing occurred while committing child molesting and that the victim was less than twelve years of age as aggravators. The Indiana Supreme Court held that "the aggravating circumstances at issue … address different policies, even though the age of victim is an overlapping factor of both." *Id.* at 434.

Here, the age of the victim aggravating factor "focuses on the status of the victim, arising from the need to give heightened protection to younger children and to punish more severely those who harm them." *Id.* The shaken baby aggravating factor focuses on the nature and circumstances of the crime. We conclude that the policy behind each aggravator is different and

that they are not impermissibly duplicative. *See, e.g., id.*

### 2. *Effect of Statute and Weight of Aggravating Factor*

▮▮▮▮ Ray argues that Blake's age was covered by the enhancement of the battery charge from a C felony to an A felony. Ray also argues that we should conclude that the trial court erred when it assigned significant weight to Blake's age. "It is for the trial judge to determine the sentencing weight to be given the aggravating or mitigating circumstances." *Shields v. State*, 523 N.E.2d 411, 414 (Ind.1988). The trial court's assessment of the proper weight of mitigating and aggravating circumstances and the appropriateness of the sentence as a whole is entitled to great deference and will be set aside only upon a showing of an abuse of discretion. *Thacker v. State*, 709 N.E.2d 3, 10 (Ind.1999), *reh'g denied.*

Ray cites *Francis v. State*, 817 N.E.2d 235, 236 (Ind.2004), for the proposition that "when the age of the victim is both a material element of the offense and an aggravator, this aggravator should be given minimal weight .... [and] the use of such an aggravator should not justify the imposition of an enhanced sentence." Appellant's Brief at 25. We disagree. In *Francis*, the defendant pleaded guilty to child molestation as a class A felony.[5] *Francis*, 817 N.E.2d at 236. In *Francis*, the applicable statute provided, in pertinent part:

> A person who, with a child under fourteen (14) years of age, performs or submits to sexual intercourse or deviate sexual conduct commits child molesting, a Class B felony. However, the offense is a Class A felony if ... it is committed

by a person at least twenty-one (21) years of age.

Ind.Code 35–42–4–3 (2004). The trial court found that the age of the victim was less than twelve years was an aggravating circumstance. *Francis*, 817 N.E.2d at 237. The Indiana Supreme Court held:

> As to the age of the victim being less than 12–years–old, we note that the charging information used by the State here alleged that the defendant had molested a child "under twelve (12) years of age." As this aggravating circumstance does no more than set forth the allegation of the charging information, we find that it does not support enhancing the defendant's sentence. However, the record does show that the victim was 6–years–old. Although the age of the victim has been taken into account to some extent by the fact that the offense is a Class A felony, the young age of the victim is an aggravating circumstance to which we assign weight in the low to medium range.

*Id.* at 238 (internal citation omitted). The Indiana Supreme Court held that an aggravating circumstance that merely sets forth the allegation of the charging information does not support enhancing the defendant's sentence; however, the young age of the victim can be an aggravating circumstance. *Id.*

Here, the applicable statute, Ind.Code § 35–42–2–1, is similar to the applicable statute in *Francis*, and provides, in pertinent part:

> A person who knowingly or intentionally touches another person in a rude, insolent, or angry manner commits battery ... a Class A felony if it results in the death of a person less than fourteen (14) years of age and is committed by a

---

5. Ind.Code § 35–42–4–3 (2004).

person at least eighteen (18) years of age.

In *Francis*, the Indiana Supreme Court assigned weight in the low to medium range for the aggravating circumstance of the young age of the victim but did not require such a weight. We conclude that the trial court did not abuse its discretion by assigning the aggravating factor of Blake's age significant weight. *See, e.g., Warlick v. State*, 722 N.E.2d 809, 813–814 (Ind.2000) (holding that the trial court did not abuse its discretion when it gave aggravating factors considerable weight).

## B. *In Need of Correctional or Rehabilitative Treatment*

 Ray argues that the trial court abused its discretion by using this aggravating factor because the trial court misconstrued the nature of this aggravator and there is nothing in the record to indicate that Ray is in need of correctional or rehabilitative treatment. When using this aggravator to support an enhanced sentence, "it is not enough that the sentencing court simply recite the statutory language." *Ajabu v. State*, 722 N.E.2d 339, 343 (Ind.2000), *reh'g denied*. Rather, "for this aggravator to support an enhanced sentence, the court must give a specific and individualized reason why the defendant is in need of correctional treatment that can best be provided by a period of incarceration in excess of the presumptive sentence." *Id.* "[T]hat which cannot be used to enhance a sentence cannot be used to 'balance' circumstances that may properly serve to reduce the sentence as mitigators." *Laughner v. State*, 769 N.E.2d 1147, 1162 (Ind.Ct.App.2002), *reh'g denied, trans. denied, cert. denied*, 538 U.S. 1013, 123 S.Ct. 1929, 155 L.Ed.2d 849 (2003).

The trial court found:

The trial court finds probation is unnecessary given that the defendant is not very likely to reoffend. The defendant's correctional and rehabilitative treatment can best be provided by commitment to a penal facility. The defendant must be responsible and accountable for the crime he has committed. Being responsible and accountable means there will be consequences. These consequences are correctional and rehabilitative treatment that can best be provided by commitment to a penal facility. Incarceration is most appropriate for this crime and this defendant.

Appellant's Appendix at 384.

Here, the trial court failed to provide the necessary explanation of why Ray needed treatment in a penal facility. Accordingly, the trial court abused its discretion by relying on this factor. *See, e.g., Laughner*, 769 N.E.2d at 1161–1162 (holding that "apart from its reference to facts inherent in the crime of which [the defendant] was committed, the trial court failed to provide the necessary explanation of why [the defendant] needed treatment in a penal facility").

 The trial court considered one improper aggravator, i.e., Ray's need for correctional or rehabilitative treatment that can best be provided by commitment to a penal facility. We will remand for resentencing if we cannot say with confidence that the trial court would have imposed the same sentence if it considered the proper aggravating and mitigating circumstances. *McCann v. State*, 749 N.E.2d 1116, 1121 (Ind.2001). Here, although the trial court considered one improper aggravating factor, the trial court specifically assigned the improper aggravator "very little to almost no weight." Appellant's Appendix at 382. Further, the trial court considered two other valid aggravating factors, which it assigned moderate and significant weight, against two moderately weighted mitigating factors and two mini-

mally weighted mitigating factors. We can say with confidence that the trial court would have imposed the same presumptive sentence if it considered the proper aggravating and mitigating circumstances. *See, e.g., McCann,* 749 N.E.2d at 1121 (declining to remand for resentencing where the trial court considered one improper aggravating circumstance, but considered three other valid aggravating circumstances).

### IV.

 The next issue is whether the sentence is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ray argues that the presumptive sentence was inappropriate and asks that we reduce his sentence.

Our review of the nature of the offense reveals that, while Ray was entrusted with the care of his two-year-old nephew, Blake, he shook Blake with such force that Blake suffered retinal hemorrhages and subdural hematoma. Blake ultimately died from his injuries. Dr. West testified that Blake's injuries were "clearly one of the most devastating" he had seen in his medical career. Transcript at 635.

We next review the character of the offender. Ray argues that his character does not justify the presumptive sentence and points to his record in raising his four children and the testimony of family and friends. Ray has always been gainfully employed and has always supported his wife and family. The record reveals that Ray has no previous convictions.

Given the extreme consequences of Ray's battery upon Blake and after due consideration of the trial court's decision, we cannot say that the presumptive thirty-year sentence imposed by the trial court is inappropriate in light of the nature of the offense and the character of the offender. *See, e.g., Laux v. State,* 821 N.E.2d 816, 823 (Ind.2005) ("Although we agree that [the defendant's] lack of criminal history, work ethic, educational achievement, and remorse have value; we cannot ignore the brutality of the crime that he committed. In light of all of the circumstances surrounding [the defendant's] crime, we are not persuaded that the sentence is inappropriate.").

For the foregoing reasons, we affirm Ray's conviction for battery resulting in death as a class A felony.

Affirmed.

BAILEY, J. and DARDEN, J. concur.