## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 30 2020, 9:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Darren D. Bedwell
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian A. McLean
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Aaron L. Strahl,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

September 30, 2020

Court of Appeals Case No.
19A-CR-2847

Appeal from the
Perry Circuit Court

The Honorable
M. Lucy Goffinet, Judge

Trial Court Cause No.
62C01-1803-F5-229

**Kirsch, Judge.**

[1]  Aaron L. Strahl ("Strahl") appeals his conviction for home improvement fraud[1] as a Level 5 felony, and raises three issues on appeal, which we restate as:

> I. Whether the State presented sufficient evidence to support Strahl's conviction;
>
> II.  Whether the trial court abused its discretion in denying Strahl's motion for a mistrial; and
>
> III.  Whether the State's closing argument denied Strahl's right to a fair trial?

[2]  We affirm.

## Facts and Procedural History

[3]  In the spring of 2017, Margaret Dietel ("Dietel") decided to remodel her home in Tell City, Indiana. *Tr. Vol. 2* at 219. A loan officer at the German American Bank referred Dietel to Strahl, who remodeled homes. *Id*. at 219-20; *Tr. Vol. 3* at 40-41. Strahl's estimate, for $33,570.00, included "[t]otal kitchen remodel" "[c]abinets, countertop, sink, new trim, new chair rail, ect [sic] all material to remodel kitchen"; "[n]ew carpet and vinyl throughout entire house"; remodeling a bathroom; removing an old concrete sidewalk and placing new vinyl railing on her porch and up the steps to her house; and erecting a white

---

[1] *See* Ind. Code § 35-43-6-12(a)(3); Ind. Code § 35-43-6-13(c).

vinyl privacy fence around her back yard. *Ex. Vol.* at 4-7. Dietel decided she could not afford the privacy fence but agreed that Strahl could perform the other work. *Tr. Vol. 2* at 221, 231.

[4] When Strahl began working in early April 2017, he asked Dietel to pay "at least half of the total labor . . . for the whole project, and [she] wrote him out a check." *Id.* at 232. Dietel asked Strahl if he knew someone who would tear down an old fence, and Strahl said that he and his wife could do that and asked for $600.00, which Dietel paid to Strahl. *Id.* at 248; *Ex. Vol.* at 12. The total of Dietel's other checks written to Strahl in April was approximately $13,400.00. *Id.* at 11. Among these other payments was an $800.00 check Dietel wrote Strahl for "concrete." *Id.*

[5] Strahl and a helper began by tearing out Dietel's kitchen cabinets. *Tr. Vol. 2* at 20-21. During this part of the work, Strahl told Dietel that he could provide her with used upper cabinets and paint them white, and so on May 19, 2017, Dietel paid Strahl another $1,200.00 for those cabinets and $500.00 for Strahl's labor. *Tr. Vol. 3* at 21; *Ex. Vol.* at 12. On another day, Strahl came to Dietel's house and told her "he was hurting for money, that his wife was a diabetic and he was hurting for money and didn't know if he could afford medicine." *Tr. Vol. 2* at 233. To help Strahl, Dietel gave him more work, asking him to knock out two walls. *Id.* Strahl asked for another $2,500.00 to do this work, and on June 27, 2017, Dietel gave Strahl another check for $2,479.41 to knock out the walls. *Ex. Vol.* at 14. By early May, Dietel had paid Strahl approximately $18,000.00. *Id.* at 11-13.

[6] Dietel saw flaws in Strahl's work. *Tr. Vol. 2* at 233-34. Strahl left building materials, including wainscoting, outside Dietel's home, where they were exposed to the elements. *Tr. Vol. 3* at 33; *Tr. Vol. 4* at 11; *Ex. Vol.* at 31, 47. The wainscoting warped, but Stahl installed it anyway, trying to conceal the warping with putty and paint. *Tr. Vol. 3* at 33; *Tr. Vol. 4* at 11; *Ex. Vol.* at 47. Strahl also used the wrong molding in places, and he placed a washer/dryer unit too close to Dietel's water heater, which would make it awkward to move the washer/dryer unit. *Tr. Vol. 2* at 233-34. Dietel asked Strahl to put the washer/dryer where she had originally requested, but Strahl did nothing. *Id*. at 234. Strahl's original helper stopped coming, and, after that, Dietel recalled, Strahl "slacked" on the work. *Id*. Different men would show up with Strahl, and Strahl would stay only for about thirty minutes before leaving. *Id*.

[7] Dietel kept paying Strahl, writing him checks totaling $1,162.85. *Ex. Vol.* at 15, 16. One of these checks, for $1,000.00 was for one of the two walls Strahl removed, although Dietel had already paid Strahl $2,479.41 when he quoted her $2,500.00 to remove the two walls. *Tr. Vol. 2* at 232-33; *Tr. Vol. 3* at 24, 42; *Ex. Vol.* at 14, 16. By the end of September 2017, Strahl had incorrectly placed two doors, hanging a closet door in the main doorway of Dietel's bedroom. *Tr. Vol. 2* at 235. The closet door was too small for the main door's jamb, leaving a gap between the door and door frame. *Id.*; *Tr. Vol. 3* at 35. The entrance door was too large for the closet doorway, so Strahl told his helper to use a saw and cut down the side of the door so that it could close. *Tr. Vol. 2* at 235; *Tr. Vol. 3* at 35. Bill Alvey ("Alvey"), Tell City's building inspector, later examined this

door and testified that "it looked like somebody took maybe a Skil saw or a Sawzall and just went down and cut the edge of the door off so that it would fit. But this is a door that had a veneer on it and so when they cut that edge off, the fiber inside is all that was showing." *Tr. Vol. 4* at 13. A door handle was never installed. *Tr. Vol. 3* at 81. New flooring was installed, but Strahl allowed paint and putty to drop onto it. *Id*. at 31-32; *Ex. Vol.* at 33-37. Dietel thought her floor was ruined. *Tr. Vol. 3* at 32. Windows, doors, and hallways had been left untrimmed, trimmed but unpainted, or without crown molding. *Id*. at 32, 34; *Tr. Vol. 4* at 11; *Ex. Vol.* at 53-58.

[8] Strahl had also improperly hung Dietel's kitchen cabinets. *Tr. Vol. 3* at 32; *Tr. Vol. 4* at 10. He hung one cabinet so high that Dietel needed to use a ladder to reach it; she asked Strahl to lower it, but he said "no, no, it will be okay. That will be good storage." *Tr. Vol. 3* at 33. Strahl left shelves and a cabinet door uninstalled and shoved Dietel's oven against the wall instead of leaving space for the oven and oven drawer to open. *Tr. Vol. 4* at 9. Strahl left a gap between two cabinets, hanging two cabinets only on one side and leaving the other side unattached. *Tr. Vol. 3* at 32. A board placed across both cabinets and over the gap was also misaligned. *Tr. Vol. 4* at 10-11. Strahl ripped a wall from the floor, which left marks on the floor, but he did not remove or cover the marks. *Id*. at 9; *Ex. Vol.* at 37. One wall was left unfinished and unpainted. *Tr. Vol. 3* at 34. On two of the two-door cabinets, Strahl only put up a single door that was too large for the cabinet's design. *Id*. at 32; *Tr. Vol. 4* at 10, 13-14. The shelves in Dietel's kitchen were left uninstalled. *Tr. Vol. 3* at 35.

[9]     Dietel spoke to Strahl about finishing the projects, but when she did, Strahl "acted aggravated but in a, you know, oh, I hate to use this word, but like in a cocky way." *Tr. Vol. 2* at 238. Finally, on October 1, 2017, Dietel told Strahl that she needed him to deliver the completed project by at least the following March, when she would be gone to stay with her granddaughter, who was pregnant. *Id*. at 235. She said, "If you don't get it done, I'm going to take you to court, you know, and he says 'no you won't. You won't win.'" *Id*. Strahl explained that his agreement with Dietel did not include a timeline. *Id*. Dietel then grabbed an envelope and wrote the following on the envelope: "Aaron Strahl promises to finish job at 1801 St. Tell City, Ind. including concrete sidewalk and bannister and railing on porch in 1 month with the whole thing being completed." *Id*.; *Ex. Vol.* at 9. She presented the envelope to Strahl, who signed it. *Tr. Vol. 2* at 235; *Ex. Vol.* at 9.

[10]    After that, Dietel said she "barely even saw [Strahl] . . . . I called him and he wouldn't answer." *Tr. Vol. 2* at 239. Dietel went to various locations looking for Strahl, and when she found him, she asked him when he was going to finish her home. *Id*. Dietel's efforts were ineffective: "Oh, he'd come down maybe once or twice – once a week or something but he'd be taken [*sic*] a paintbrush and painting the same spot over again but he really didn't do any quality work." *Id*. With Halloween approaching, Dietel asked Strahl to put caution tape around the rough, exposed ground where Strahl had torn out her old sidewalk. *Id*.; *Ex. Vol.* at 19. Someone later came to her house and put up some stakes

and caution tape, but there was still no path from the sidewalk to Dietel's front door. *Tr. Vol. 2* at 239; *Ex. Vol.* at 19.

[11] The next contact Strahl had with Dietel was in January 2018. *Tr. Vol. 3* at 24. Strahl said he was going to install Dietel's front walkway but demanded another $539.00 for concrete to finish that part of the work. *Tr. Vol. 2* at 242; *Tr. Vol. 3* at 24-25. Dietel had already written Strahl an $800.00 check for concrete in April of 2017. *Ex. Vol.* at 11. Nonetheless, Dietel wrote Strahl a second check in the new amount Strahl demanded. *Id*. at 17. Dietel waited until February 2018, and Strahl still had not completed the work on Dietel's sidewalk or home. *Tr. Vol. 3* at 24-25, 64-65, 81. Other than Strahl's estimate, Strahl never provided Dietel with an invoice, receipts, or any other documentation about his work. *Id*. at 23-24. Dietel testified she paid Strahl over $23,000.00 altogether. *Id*. at 80.

[12] In February 2018, Dietel sought help from several people, including Alvey and Tell City Police Sergeant Jason Shadwick ("Sergeant Shadwick"). *Tr. Vol. 2* at 243. At some point during that month, Sergeant Shadwick advised Dietel to cease contact with Strahl. *Tr. Vol. 3* at 60. Although Strahl called and texted Dietel, she followed Sergeant Shadwick's advice, testifying, "I had no guarantee that he would just come in[,] slap a little bit of paint up[,] and then after an hour, leave," and that "I was afraid I made him mad." *Id*. at 51, 60.

[13] Alvey tried to get Strahl to complete the work; he called Strahl and spoke to him once. *Id.* at 249; *Tr. Vol. 4* at 22. Alvey testified that Strahl "was not happy

that Mrs. Dietel had contacted me, he saw no reason for that to happen. And that he was going to finish – he was going to finish the work." *Tr. Vol. 4* at 27. After their first conversation, Alvey tried several times to talk to Strahl, but Strahl would not return Alvey's calls. *Id.* at 22.

[14] On March 21, 2018, Strahl was charged with home improvement fraud, a Level 5 felony, and the State filed an amended information on September 12, 2019. *Appellant's App. Vol. II* at 19, 59. The jury trial commenced on September 23, 2019. *Tr. Vol. 2* at 44. During Strahl's cross-examination of Sergeant Shadwick, Strahl asked him whether he wrote supplemental reports to aid him during his testimony, and Strahl asked Shadwick to hand over his investigative file for an in-court inspection. *Tr. Vol. 3* at 151-52. The trial court then held a hearing outside the presence of the jury, and Strahl's counsel asked Sergeant Shadwick about a paper Strahl's counsel had seen in the file that Sergeant Shadwick had given to him. *Id.* at 152-53, 161-62; *Conf. Ex. Vol.* at 137-40. Sergeant Shadwick said the document was "just preparing for the trial" and "that it was prepared in discussion with the prosecutor's office." *Tr. Vol. 3* at 161-62. Sergeant Shadwick agreed that the document contained "[q]uestions and what appeared to be suggested answers," but he said he did not read from the document or "looking at anything off that" when he testified. *Id.* at 163-64. Sergeant Shadwick described it as "kind of an outline so to speak to refresh our memory. There's a lot of times that goes in between these cases, but I've got a high caseload. So try to remember everything is a challenge in itself." *Id.* at 164. After some additional questions regarding case records that were not in

the file that Sergeant Shadwick had brought with him to court, the trial court granted Strahl's request to visit the records department of the Tell City Police Department early the next morning to inspect its case records. *Id*. at 182-84.

[15] The following morning, Strahl argued that the use of the document to prepare Sergeant Shadwick's testimony tainted his testimony because the document reflected the State's perspective on the case. *Id*. at 192-93. Strahl contended that his ability to cross-examine Sergeant Shadwick regarding the document was an insufficient remedy. *Id*. at 193-94. Strahl raised the possibility of a mistrial but then said, "As an officer of this Court, I don't believe a motion to dismiss is proper. I don't think there's a basis for it. I don't think that's the right thing." *Id*. at 196. Strahl asked the trial court to strike Sergeant Shadwick's testimony and to admonish the jury accordingly saying, "that's the proper remedy at the stage we're in." *Id*. at 197. The trial court ruled that Strahl's argument went to the weight of Sergeant Shadwick's testimony and that cross-examining Sergeant Shadwick about the document would adequately protect Strahl's rights. *Id*. at 210-11. Strahl then asked for a mistrial, and the trial court denied his motion. *Id*. at 217.

[16] Strahl then continued to cross-examine Sergeant Shadwick. *Id*. at 223. During the cross-examination, Sergeant Shadwick mentioned that he had used similar documents when testifying in other cases. *Id*. at 234. In a hearing outside the jury's presence, Strahl told the trial court that he was not suggesting misconduct by the prosecuting attorneys: "Now, I don't think that Mr. Wilkinson would have been involved. And I certainly have no reason to believe that Mr. Hoch

would have been involved. But apparently, this officer has done this before. And that's what you just heard." *Id*. at 235. Strahl renewed his motion to strike Sergeant Shadwick's testimony and to admonish the jury, alluding to his previous mistrial request as follows:

> And then if the Court denies that motion, then I'm going to have to address it in a different way, just so the Court knows I will have another motion. But I don't know what else to do. And I'm troubled by the fact – I wish we had heard him – I'll take a little blame. I didn't think that's whether you'd done this before, because I assumed, as I told the Court, as an officer of the court in complete disclosure, I really believed that that wasn't the case. I stand corrected.

*Id*. at 237. The trial court noted that on the day before, it too had thought this was not an intentional act by Sergeant Shadwick, and that his new testimony justified granting Strahl's motion to strike Sergeant Shadwick's testimony. *Id*. at 240.

[17] When the jury returned to the court room, the trial court admonished the jury as follows:

> At this time, ladies and gentlemen, I am instructing you to disregard any of the testimony of Officer Shadwick. You must not concern yourselves with the reason for this ruling. My rulings are strictly controlled by law. You must not consider such evidence in making your decision. I may strike evidence or testimony from the record after you have already seen or heard it, and again, you must not consider such evidence in making your decision.

> Your verdict should be based on the evidence admitted and instructions of law. Nothing that I say or do is intended to recommend what facts or what verdict you should find.

*Id*. at 246.

As part of his defense, Strahl called one of his former employees, Thomas Lasher, who had worked at Dietel's house until late September 2017; Lasher testified that given the state of Dietel's house when he quit working for Strahl, the remaining work on Dietel's home could have been completed in two weeks. *Id*. at 246; *Tr. Vol. 4* at 36-37, 44, 47. After closing arguments, the jury found Strahl guilty as charged. *Tr. Vol. 4* at 99-100. The trial court later sentenced Strahl to three years, suspended in favor of Strahl's participation in a community-corrections program. *Appellant's App. Vol. II* at 144. Strahl now appeals.

## Discussion and Decision

## I. Sufficiency of Evidence

Strahl contends the evidence was insufficient to support his conviction for Level 5 felony home improvement fraud. When we review the sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005). Rather, we will affirm a conviction if we find that any reasonable factfinder could find a defendant guilty beyond a reasonable doubt when considering all the facts and inferences that favor the conviction. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind.

2009).  The evidence need not exclude every reasonable hypothesis of innocence, but it must support a reasonable inference of guilt to support the verdict.  *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007).

[20]  Under the home improvement fraud statute, the State was required to prove:

> (a) A home improvement supplier who enters into a home improvement contract and knowingly: . . . (3) promises performance that the home improvement supplier does not intend to perform or knows will not be performed . . . commits home improvement fraud, a Class B misdemeanor, except as provided in section 13 of this chapter.

Ind. Code § 35-43-6-12(a)(3).  "The offense . . . is a Level 5 felony (1) if . . . the consumer is at least sixty (60) years of age and the home improvement contract price is at least ten thousand dollars ($10,000)."  Ind. Code § 35-43-6-13(c)(1).[2]

[21]  More specifically, Strahl contends that the evidence established, at most, that he did not complete the work within the time period that he and Dietel had agreed to and that the quality of some of his work was substandard.  He claims such evidence is insufficient under the home improvement fraud statute because that statute criminalizes fraudulent promises, that is, promises "that the home improvement supplier does not intend to perform or knows will not be performed."  *See* Ind. Code § 35-43-6-12(a)(3).  Such language, Strahl contends,

---

[2] Strahl does not contend the State failed to present sufficient evidence that Dietel was at least sixty years old and that the home improvement contract's price was at least $10,000.

does not criminalize work that was substandard and untimely. In addition, Strahl contends that he completed most of the work on the home improvement, and this fact further undermines the State's claim that he did not intend to perform Dietel's home improvement project or knew that he would not complete the project.

[22] Here, based on the testimony of Dietel and Alvey, and the State's exhibits, it was reasonable for the jury to conclude that Strahl did not intend to perform the remodeling of Dietel's home or knew that he would not perform it. *See* Ind. Code § 35-43-6-12(a)(3); Ind. Code § 35-43-6-13(c). First, Strahl failed to complete a substantial amount of work, supporting the inference that he did not intend to complete the remodeling project. Strahl improperly hung Dietel's kitchen cabinets. *Tr. Vol. 3* at 32; *Tr. Vol. 4* at 10. He hung one cabinet so high that Dietel would need to use a ladder to reach it; she asked Strahl to lower it, but he said "no, no, it will be okay. That will be good storage." *Tr. Vol. 3* at 33. Strahl left shelves and a cabinet door uninstalled. *Tr. Vol. 4* at 9. Strahl left a gap between two cabinets, hanging two cabinets only on one side and leaving the other side unattached. *Tr. Vol. 3* at 32; *Ex. Vol.* at 39. Windows, doors, and hallways had been left untrimmed, trimmed but unpainted, or without crown molding. *Id*. at 32, 34; *Tr. Vol. 4* at 11; *Ex. Vol.* at 53-58. A handle on one of the doors was never installed. *Tr. Vol. 3* at 81. Strahl ripped a wall from a floor, which left marks on the floor, but Strahl did not remove or cover the marks. *Id*. at 9; *Ex. Vol.* at 37. A wall was left unfinished and unpainted. *Tr. Vol. 3* at 34. A new back door Dietel had paid for was left outside and never installed. *Id*. at

22, 25. Strahl lost a cabinet door and never replaced it. *Id*. at 32. A wall was left in an unsightly, unfinished state. *Id*. at 34; *Tr. Vol. 4* at 11; *Ex. Vol.* at 55. Strahl agreed to tear down some walls, but he did not complete that task. *Tr. Vol. 2* at 233; *Tr. Vol. 3* at 34; *Tr. Vol. 4* at 11; *Ex. Vol.* at 11-13.

[23] Second, despite Strahl's argument to the contrary, his failure to complete the project in a timely fashion also provided sufficient evidence that he did not intend to complete the remodeling project or knew that he would not complete the project. Strahl began working in early April 2017. *Tr. Vol. 2* at 232. Six months later, in September 2017, Dietel was exasperated by Strahl's lack of progress and threatened to sue him. *Id.* at 235. Strahl correctly noted that his initial agreement with Dietel did not include a completion date, so on October 1, 2017, Dietel wrote an agreement, which Strahl signed, that required Strahl to complete the project in one month, by November 1, 2017. *Id*.; *Ex. Vol.* at 9. After that, Dietel "barely even saw [Strahl],' and he would not return her phone calls. *Tr. Vol. 2* at 239. Even after Dietel tracked down Strahl at his other work sites and confronted him about the lack of progress on her remodeling project, Strahl would come to Dietel's home to only half-heartedly paint "the same spot over again" but did not perform any "quality work" toward finishing the remodeling job. *Id*.

[24] The next contact Strahl had with Dietel was in January of 2018. *Tr. Vol. 3* at 24. Strahl said he was going to install Dietel's front walkway but demanded another $539.28 for concrete to finish that part of the work. *Id*. at 24. Dietel had already written Strahl an $800.00 check for concrete, but she wrote Strahl a

second check in the new amount Strahl demanded. *Ex. Vol.* at 6, 17. Dietel waited until February 2018, and Strahl had still not completed the sidewalk. *Tr. Vol. 2* at 242; *Tr. Vol. 3* at 24-25, 64, 81. Finally, nearly one year after Strahl began work, and three months after Strahl had failed to meet the timeline established by the agreement he signed on October 1, 2017, Dietel reached out to Alvey and Sergeant Shadwick for help. *Tr. Vol. 2* at 243.

[25] Therefore, based on Strahl's failure to complete certain aspects of the remodeling project and his refusal to meet the timeline he agreed to in the October 1, 2017 agreement, the State presented sufficient evidence to prove beyond a reasonable doubt that Strahl "promise[d] performance" that he did "not intend to perform or [knew] [would] not be performed." Ind. Code § 35-43-6-12(a)(3). The evidence for Strahl's conviction for home improvement fraud was sufficient.

## II. Denial of Motion for Mistrial

[26] Strahl argues that the trial court abused its discretion in denying his motion for mistrial. The decision to grant or deny a motion for mistrial lies within the discretion of the trial court. *Ray v. State*, 838 N.E.2d 480, 486 (Ind. Ct. App. 2005), *trans. denied*. The trial court is given "great deference" on appeal, *Treadway v. State*, 924 N.E.2d 621, 628 (Ind. 2010), because it "is in the best position to gauge the surrounding circumstances of the event and its impact on the jury." *Knapp v. State*, 9 N.E.3d 1274, 1284 (Ind. 2014). Granting a motion for mistrial is an extreme remedy that is justified only when less severe remedies

will not satisfactorily correct the error. *Ray*, 838 N.E.2d at 486. To prevail on a motion for mistrial, a defendant must show she was placed in a position of grave peril to which she should not have been subjected. *Id*. The gravity of the peril is determined by the probable persuasive effect on the jury's decision. *Id*.

[27] Strahl's argument focuses on the testimony of Sergeant Shadwick, which the trial court struck and then admonished the jury to disregard. Citing *Francis v. State*, Strahl acknowledges that we normally presume that a jury follows a trial court's admonishment. 758 N.E.2d 528, 532 (Ind. 2001). Nonetheless, Strahl argues that we should reject this presumption "because the prejudicial impact of [Sergeant] Shadwick's testimony was so great." *Appellant's Br.* at 25. This is so, he contends, because Sergeant Shadwick's testimony was central to the State's case. Finally, Strahl argues it would be credulous to believe the trial court's admonishment cured the prejudicial impact of Sergeant Shadwick's testimony: "The naive assumption that prejudicial effects can be overcome by instructions to the jury [. . .] all practicing lawyers know to be unmitigated fiction." *Appellant's Br.* at 27 (quoting *White v. State*, 257 Ind. 64, 70, 272 N.E.2d 312, 315 (1971)).

[28] It is well settled that under the invited error doctrine a party cannot affirmatively ask a trial court to take a certain course of action but then appeal an adverse result at trial by arguing the trial court should not have agreed with the party's own request. *Batchelor v. State*, 119 N.E.3d 550, 556 (Ind. 2019); *Durden v. State*, 99 N.E.3d 645, 651 (Ind. 2018); *Wright v. State*, 828 N.E.2d 904, 907 (Ind. 2005). On both occasions where Sergeant Shadwick's testimony was

at issue, Strahl asked the trial court to strike Sergeant Shadwick's testimony, saying that striking the evidence was the only proper relief, and that a mistrial would be conceivable only if the trial court denied the motion to strike. *Tr. Vol. 3* at 196-97, 237. When the trial court agreed with Strahl and struck Sergeant Shadwick's testimony, Strahl helped craft an admonishment that he thought was appropriate. *Id*. at 241-44, 246. He did not object to the admonishment. *Id*. at 245. Thus, Strahl is not entitled to relief on his claim that the admonishment was insufficient because even if the admonishment had been inadequate, Strahl would be appealing an error he invited, which he cannot do. *See Batchelor*, 119 N.E.3d at 556.

## III. The State's Closing Argument[3]

[29] Strahl contends that the State's references to the stricken testimony of Sergeant Shadwick during the State's closing argument denied Strahl's right to a fair trial. For instance, Strahl points to the State's Power Point presentation, which consisted of fifty slides. *Ex. Vol.* at 100-26. Strahl directs us to two slides the State used during its closing argument, which describe the "surrounding circumstances" of Strahl's actions. *See id*. at 120-21. These slides list some of the checks that Dietel wrote to Strahl and also mention Strahl's request to Dietel for extra work because he was short on money. *Id*. Strahl appears to

---

[3] Strahl also argues under this third issue that the trial court's admonishment to the jury to disregard Sergeant Shadwick's testimony was inadequate. Because we have addressed that issue in section II of this decision, we need not address it again.

contend this information came only from Sergeant's Shadwick's stricken testimony and that by referring to this evidence, the State denied Strahl's right to a fair trial.

[30] Strahl has waived this claim for two reasons. First, he failed to object during the State's closing argument. "In order to properly preserve an issue on appeal, a party must, at a minimum, 'show that it gave the trial court a bona fide opportunity to pass upon the merits of the claim before seeking an opinion on appeal.'" *In re Involuntary Termination of Parent-Child Relationship of B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (quoting *Cavens v. Zaberdac,* 849 N.E.2d 526, 533 (Ind. 2006)), *trans. denied*. Because he failed to object during the State's closing argument, Strahl has waived this claim. Second, Strahl has waived this claim because he does not support his argument with citation to legal authority. *See Lacey v. State*, 124 N.E.3d 1253, 1257 n.8 (Ind. Ct. App. 2019) (failure to cite legal authority results in waiver of issue).

[31] Waiver notwithstanding, Strahl's argument lacks merit. Most of the State's closing argument relied on the testimony of Dietel, Alvey, Lasher, and the exhibits. The prosecutor referred to the poor quality of Strahl's work and his failure to complete the work. *Tr. Vol. 4* at 70-71; *Ex. Vol.* at 119. The prosecutor referred to Lasher's testimony that Strahl could have completed the job in two weeks. *Tr. Vol. 4* at 70; *Ex. Vol.* at 120. The closing argument also reviewed Dietel's testimony about the payments she made to Strahl, and Dietel's willingness to give Strahl more work because he was struggling financially. *Tr. Vol. 4* at 70-71. The prosecutor also referred to the agreement

between Dietel and Strahl that Strahl would complete the project no later than November 1, 2017 and Strahl's failure to abide by that agreement. *Id.* Thus, the State's closing argument did not urge the jury to rely on Shadwick's stricken testimony, and, therefore, the closing argument did not violate Strahl's right to a fair trial.

[32]    Affirmed.

Pyle, J., and Tavitas, J., concur.