

FILED

Dec 10 2019, 9:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Involuntary Termination of the Parent-Child Relationship of: <br><br> K.L. and K.J.L. *(Minor Children),* <br> and <br><br> B.L. *(Mother)* <br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services, <br> *Appellee-Petitioner,* | December 10, 2019 <br><br> Court of Appeals Case No. 19A-JT-1211 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Faith Graham, Judge <br><br> Trial Court Cause Nos. 79D03-1802-JT-25 79D03-1802-JT-26 |

**Robb, Judge.**

# Case Summary and Issue

[1] The Indiana Department of Child Services ("DCS") filed petitions to terminate the parental rights of B.L. ("Mother") to two of her children, Ko. and Ki.[1] One witness testified on the first day of the termination hearing and then the hearing was continued. Prior to any witnesses taking the stand on the second day of the termination hearing, Mother made a motion for separation of witnesses. The juvenile court denied the motion as untimely and the remaining witnesses testified in the presence of each other. The juvenile court ultimately issued an order terminating Mother's parental rights to both children. Mother now appeals, raising the sole issue of whether she is entitled to a new trial because the juvenile court erred in denying her motion for separation of witnesses. The State concedes the juvenile court erred and further concedes prejudice is presumed in such situation, but argues the error was harmless. Concluding there is overwhelming evidence supporting the juvenile court's order terminating Mother's parental rights to Ko. and Ki. such that Mother's substantial rights were not affected by the juvenile court's error, we affirm.

---

[1] The official designation of this case is In re the Involuntary Termination of the Parent-Child Relationship of K.L. and K.J.L and Mother. We have referred to K.L. as Ko. and to K.J.L. as Ki. in this opinion.

# Facts and Procedural History

[2]     Ko. was born in November 2011 and Ki. was born in April 2013.  No legal father has been established for either child.[2]  Mother also has a third child, H., who was born in 2016 and is not subject to these proceedings.

[3]     Mother has been diagnosed with and prescribed medication for bipolar disorder.  She also has a history of using illegal substances.  In mid- to late-2013, Mother became overwhelmed caring for Ko. and Ki. and asked her sister, Natasha Foster, to care for them.  For approximately nine months after placing her children with Foster, Mother did not have any contact with them.  Ki. has continued to reside with Foster since 2013.  In late 2014, however, Foster also became overwhelmed caring for her own two children plus Mother's two children, and Kayla and Derrick Mitchell took over the care of Ko.  Mother and Foster had known Kayla since childhood.  In 2016, the Mitchells filed a petition to establish guardianship over Ko. but the guardianship proceedings were postponed when these proceedings began.

[4]     On October 29, 2016, DCS received a report that Mother had attempted to commit suicide by overdosing on heroin while H. was in her care.  Ko. and Ki. were legally removed from Mother's care on November 1, 2016, but Ki. remained with Foster in relative placement and Ko. with the Mitchells in

---

[2] The petition for termination with respect to Ki. named Mother and an "Unknown Alleged Father" as parents.  Appellant's Appendix, Volume II at 15.  The petition with respect to Ko. named Mother, L.G. as Alleged Father, and "Unknown Alleged Father" as parents.  *Id.* at 19.

kinship placement. The children were adjudicated Children in Need of Services ("CHINS") in January 2017.[3]

[5] From November 2016 to July 2017, Mother had four supervised visits and two therapeutic visits with the children. The supervised visits occurred before Mother was incarcerated in January 2017; thereafter, visits were suspended while Mother was incarcerated and then in rehab. When Mother was in a position to resume visitation, Ko. and Ki. exhibited anxiety about the possibility of returning to Mother's care and expressed that they wanted to stay where they were. They had two therapeutic visits in July 2017, but Ki. refused to attend the third scheduled visit. Mother cancelled the next scheduled visit and then declined to schedule any further visits because she did not trust the visitation supervisor. Mother's last contact with the children was in July of 2017.

[6] When DCS became involved with the family in late 2016, Mother had recently begun participating in services with the Assertive Community Treatment ("ACT") Team at Wabash Valley Alliance, which is "an intensive outpatient treatment program provided to people with serious mental health issues [and] some co-occurring disorder like addiction." Transcript, Volume 2 at 38-39. DCS recommended that Mother continue that treatment and submit to random drug screens. Mother received case management services, individual therapy,

---

[3] H. is also subject to a CHINS proceeding, but his case has proceeded on a different track due to differences in the relationships Mother has with Ki. and Ko. and with H.

and medication management through the ACT Team. However, Mother was "not really engaged in treatment." *Id.* at 44. She did not regularly attend individual therapy and did not work with her case manager. She was also not compliant with requests for drug screens; between January 2017 and January 2018, Mother was a no show for screens twenty-two times and submitted several dilute screens.[4] Also throughout the proceedings, Mother was not regularly taking medication prescribed to address her bipolar disorder and anxiety and did not have her own housing or stable employment.

[7] On February 14, 2018, DCS filed petitions to terminate Mother's parental rights to Ko. and Ki. The termination fact-finding hearing was scheduled to begin on May 4. On that date, concerns over service of the termination petitions on the children's fathers prompted the court to set the hearing over until May 9. On May 9, the juvenile court granted DCS's motion to dismiss the termination petitions as to the fathers and, as Mother had failed to appear, agreed to initiate the termination hearing for Mother, allow DCS to "put on enough evidence to secure venue and jurisdiction[,]" and continue the matter. *Id.* at 19.[5] Sally Messmer, a case manager with the Tippecanoe County office of DCS, testified that she was familiar with the children, both of whom were under the age of

---

[4] The drug screens Mother did take were almost always positive because her prescribed medications included controlled substances. Mother also tested positive for opiates on two occasions in November 2016, methamphetamine on one occasion in January 2017, and alcohol on two occasions in March 2017.

[5] On May 4, the juvenile court had expressed concern that the termination hearing needed to begin within ninety days of the filing of the petition, and as the petitions were filed on February 14, 2018, time was running short.

eighteen; she was familiar with the underlying CHINS case that was filed in Tippecanoe County in October of 2016; and the permanency plan in the CHINS case had changed from reunification to adoption. *Id.* at 20-22. Messmer did not testify to any details of the case.

[8] Also in May, Mother admitted to her case manager that she had used methamphetamine. Mother lost her housing and stayed "quite a few different places" after that. *Id.* at 174. And finally, the ACT Team discharged Mother due to her lack of engagement and the fact that there was not "any major progress made in her treatment." *Id.* at 47.

[9] When the parties returned to court to continue the termination hearing in August, Mother made a motion for separation of witnesses. The juvenile court denied her motion because her "time to move for separation of witnesses ha[d] passed." *Id.* at 31. DCS then called Nicholas DiCarlo, director of the ACT Team; Angela Stone, who provided family therapy/therapeutic visitation services; and Rachael Queen and Messmer, successive case managers for the family, as witnesses. Dorothy Rausch, the children's court appointed special advocate ("CASA") testified on her own behalf, and Mother called Foster as a witness and then testified herself.

[10] Testimony at the hearing showed that to DCS's knowledge, Mother had not participated in any further case management, therapy, or medication management services after her discharge from the ACT Team in May. Mother stated that she needed to get back on her medication and admitted she would

test positive for heroin if tested that day, although she was "not currently using" because she had last used two days ago. *Id.* at 176. Mother was unemployed – she "was supposed to start at the Hampton," but she did not go because she did not have transportation. *Id.* at 175. As for where she was staying, Mother stated, "I don't even know where I am going after I leave the courtroom." *Id.* at 174. Finally, when asked if she was "in a position right now to be a caregiver for the girls[,]" Mother answered no. *Id.* at 175.

[11] Queen testified that termination of Mother's parental rights and adoption of the children by their respective placements was in the children's best interests because it "might not be possible for [Mother] to be a functional parent of these children" given Mother's intermittent positive drug screens and lack of consistent pay and housing of her own. *Id.* at 120. Although when Queen left the case in early 2018, she felt they were "on track" to remedy the conditions that led to the children's removal, she believed Mother as the sole caregiver to the children would pose a risk to their well-being:

> It became apparent that the relationship with [Mother] as their sole caregiver was irreconcilable. There was no way to shift that paradigm of who the girls' parents were. And that there just wasn't the stability and success in the relationship with the children and [Mother] that we were looking for.

*Id.* at 121, 123. Messmer, who took over as family case manager in February 2018 after Queen left the case, testified that although Mother had "periods of progress[,]" the progress was unsustainable because of the overall lack of consistency. *Id.* at 136. Mother's mental health and lack of services addressing

her mental health were also concerns. *Id.* at 141. Messmer recommended that termination would be in the children's best interests, noting that Ki. and Ko. were "healthy and happy little girls" in their current placements and "never mention their Mother." *Id.* at 132. The CASA also testified termination was in the children's best interests.

[12] Ultimately, the juvenile court entered orders concluding there is a reasonable probability the conditions that resulted in removal of the children would not be remedied; continuation of the parent-child relationships poses a threat to the well-being of the children because they need stability and a parent with whom they can form a permanent and lasting bond; DCS's plan of adoption is a satisfactory plan for the children; and termination is in the children's best interests: "Further efforts to reunify would have continued negative effects on the children." Appealed Order at 7.

# Discussion and Decision

## I. Motion for Separation of Witnesses

[13] Mother first contends the juvenile court erred in denying her motion for separation of witnesses. Prior to January 1, 1994, the decision to grant a motion for separation of witnesses was within the trial court's discretion. *Hernandez v. State*, 716 N.E.2d 948, 950 (Ind. 1999). On January 1, 1994, however, the Indiana Rules of Evidence became effective and altered the common law rule. *Id.* Indiana Rule of Evidence 615 provides:

> At a party's request, the court *must order* witnesses excluded so
> that they cannot hear other witnesses' testimony. . . . But this
> rule does not authorize excluding:
>
> (a) a party who is a natural person;
>
> (b) an officer or employee of a party that is not a natural person,
> after being designated as the party's representative by its attorney;
> or
>
> (c) a person whose presence a party shows to be essential to
> presenting the party's claim or defense.

(Emphasis added.) Thus, the trial court is now required to grant motions for

separation of witnesses. *Id.*

[14] The juvenile court declined to grant Mother's motion because "your time to do

that has passed." Tr., Vol. 2 at 31. The purpose of Rule 615 is that "witnesses

should be insulated from the testimony of other witnesses." *Long v. State*, 743

N.E.2d 253, 256 (Ind. 2001); *see also Smiley v. State*, 649 N.E.2d 697, 699 (Ind.

Ct. App. 1995) (noting a separation of witnesses order is meant to keep the

testimony of one witness from influencing the testimony of another), *trans.

denied*. To effectively serve that purpose, a motion for separation of witnesses

should ideally be made before any witness testifies. *Williams v. State*, 924

N.E.2d 121, 125 (Ind. Ct. App. 2009), *trans. denied*. However, Rule 615 does

not address when such a motion must be made. Therefore, a motion made

after testimony has begun "may be permissible as long as basic notions of

fundamental fairness are not offended." *Anderson v. State*, 743 N.E.2d 1273,

1277 (Ind. Ct. App. 2001).  Here, one witness testified on the first day of the termination hearing and only "put on enough evidence to secure venue and jurisdiction[.]"  Tr., Vol. 2 at 19.  Mother requested a separation of witnesses order at the outset of the second day of the termination hearing before any other witnesses had been called.  Accordingly, the timing of Mother's motion did not affect the fundamental fairness of the proceeding and the juvenile court should have granted the motion and ordered separation of the witnesses.  *See Anderson*, 743 N.E.2d at 1277 (holding defendant's motion for separation of witnesses, made shortly after the State began questioning its first witness, should have been granted because the witness had only begun to testify about general background information); *see also* Brief of Appellee at 15 (DCS conceding the juvenile court erred in denying Mother's motion "because there is no time requirement for requesting the separation").

## II.  Prejudice from Denial of Motion

[15]     Mother requests we reverse the juvenile court's termination order and remand for a new trial because of the error.  However, an error with respect to the separation of witnesses does not necessarily mandate reversal.  The parties agree that prejudice is presumed when Rule 615 is violated but that the presumption can be overcome if the party supporting the result can show there was no prejudice.  *See* Brief of Appellant at 18, Br. of Appellee at 14; *see also Williams*, 924 N.E.2d at 126.  The State, although acknowledging the juvenile court erred, asserts that the error was harmless and therefore, not grounds for reversal.  Error in failing to separate witnesses is harmless error if the opposing

party presents overwhelming evidence supporting the judgment. *See Ray v. State*, 838 N.E.2d 480, 488-89 (Ind. Ct. App. 2005), *trans. denied*; *see also Anderson*, 743 N.E.2d at 1277 (noting that denial of a motion to separate witnesses is harmless if, in light of all the evidence in the case, the error is sufficiently minor so as to not affect the defendant's substantial rights).

[16] It is undisputed that the witnesses were all present for each other's testimony at the termination hearing. *Cf. Anderson*, 743 N.E.2d at 1277 (holding the trial court's erroneous denial of motion for separation of witnesses did not affect defendant's substantial rights because there was no evidence that any witnesses were in the courtroom for the testimony of other witnesses). The juvenile court named the people in the courtroom at the beginning of the hearing, *see* Tr., Vol. 2 at 28-29, and Mother points out several examples of a witness referring to an earlier witness's testimony. For instance, when Messmer was asked why she felt it was appropriate to proceed with termination in this case at the same time she was recommending a trial home visit in Mother's case with H., Messer answered, "Same as what Rachael Queen had stated. Mother was in two (2) different places regarding her relationships with her children." Tr., Vol. 2 at 133-34. In addition, DCS referenced earlier witnesses' testimony in its questioning. *See, e.g., id.* at 101 (DCS asking Queen, "So you heard [Stone] testify here today?"). Mother posits that "[i]t is not at all certain that the effect of this error on the court's decision was sufficiently minor so as not to affect Mother's substantial rights." Br. of Appellant at 21. We disagree.

[17]     First, the impact of the error was minor. As the State points out, Mother, as a party; Messmer and Queen, as DCS representatives; and Rausch, as the CASA, would have been permitted to stay in the courtroom as a party's representative or an essential witness. *See* Evid. R. 615; *see also Stafford v. State*, 736 N.E.2d 326, 331 (Ind. Ct. App. 2000) (noting in a criminal case that the State is permitted to designate only one investigating officer as its party representative but an additional investigating officer may remain if the trial court finds he or she is an essential witness in the case), *trans. denied*. DiCarlo was the first witness and thus heard no other witnesses' testimony before he testified. That leaves Stone and Foster as the only witnesses impacted by the juvenile court's erroneous ruling. Stone, as the second witness, heard only DiCarlo's testimony before her own. DiCarlo's testimony was directed solely to Mother's participation in the ACT Team which involved individual therapy and medication management. Stone's testimony addressed only her counseling of the children and her supervision of Mother's interactions with the children during the brief time they engaged in therapeutic visitation. There is little chance that DiCarlo's testimony influenced Stone's testimony in any way because they were involved in entirely different aspects of the case. Foster, who was the sixth witness and was called by Mother, provided information about how the children came to be in her care and her relationship and interactions with Mother. All of her testimony was based on her personal knowledge of events occurring in 2013 and 2014. Because Foster testified to events of which she had personal knowledge and that occurred before DCS became involved, it is unlikely that her testimony was influenced by DCS's witnesses' testimony

about events occurring after 2016. The juvenile court referenced information relayed by Foster's testimony in two (out of thirty-one) findings of fact, providing only background on events that occurred before the CHINS case was opened.

[18]     Second, there is overwhelming evidence supporting the juvenile court's judgment independent of Stone and Foster's testimony. In order to terminate parental rights, the State must show by clear and convincing evidence that either there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied or there is a reasonable probability that continuation of the parent-child relationship poses a threat to the children's well-being; termination is in the children's best interests; and there is a satisfactory plan for the children's care and treatment after termination. Ind. Code § 31-35-2-4(b)(2) (elements of proof); Ind. Code § 31-37-14-2 (burden of proof). Mother voluntarily placed her children with a relative and was not in contact with them for the next nine months. When DCS became involved and Mother was offered the opportunity to resume contact with her children, she voluntarily declined to participate after seven months and had not seen her children in over a year by the time the termination hearing ended. Mother has acknowledged mental health issues that she does not consistently treat, has no current employment or permanent place to stay, and has admitted that she was not in a position to be a caretaker for her children. Messmer, Queen, and Rausch all independently and based on their own experiences with Mother and the children testified that termination was in the children's best interests. As the

children had already been out of Mother's care for three years by the time DCS became involved in this case, and as Mother's participation in services during the CHINS proceedings was minimal, we conclude the State has shown by overwhelming evidence that the juvenile court's error in denying her motion for separation of witnesses was harmless because in light of all the evidence, it did not affect her substantial rights.

# Conclusion

[19] The juvenile court erred in denying Mother's motion for separation of witnesses, but the State has shown that the error did not result in any prejudice to Mother because of the overwhelming evidence supporting the juvenile court's judgment. Accordingly, the termination of Mother's parental rights to Ko. and Ki. is affirmed.

[20] Affirmed.

Mathias, J., and Pyle, J., concur.